# AFFIDAVIT OF Thomas J. King

# SPECIAL AGENT

# BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES

I, Thomas J. King, being duly sworn, depose and state that:

## I. EXPERIENCE OF AFFIANT

I am a graduate of Buffalo State College, where I obtained a Bachelor of Science in criminal justice. I am a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Department of Justice, and have been so employed since February 14, 2001. Prior to that, I was a Special Agent with the Immigration and Naturalization Service for five years and an Inspector with the United States Customs Service for three years.

I am a graduate of the Federal Law Enforcement Training Center and the ATF National Academy. As a result of my training and experience as an ATF Special Agent, I am familiar with the federal firearms laws. Through my experience, I have also investigated numerous cases involving 18 USC § 924(c), Using or Carrying a Firearm in Relation to a Crime Involving Drug Trafficking or Possession of a Firearm in Furtherance of a Drug Trafficking Crime, and 21 USC §§ 841 et seq., Controlled Substance violations.

## II. PURPOSE OF AFFIDAVIT

Based on the facts set forth in this affidavit, there is probable cause to believe that JASON WOODS has committed violations involving the distribution and possession with the intent to distribute controlled substances, in violation of 21 USC § 841 et seq., and use of a firearm in furtherance of drug trafficking, in violation of 18 USC § 924(c).

## III. PROBABLE CAUSE

1. On April 26, 2012, I initiated an investigation of Jason WOODS after receiving information from a confidential informant that WOODS was a convicted felon known to carry a firearm and was engaged in drug trafficking. In an undercover capacity, I made contact with WOODS and began meeting WOODS on occasion to discuss drug trafficking and to purchase methamphetamine from WOODS. During the investigation, I verified WOODS' identity through record checks with the Alaska Public Information Safety Network (APSIN) and the State of Alaska Department of Motor Vehicles (DMV). I also confirmed WOODS' criminal history. WOODS was convicted of Third Degree Misconduct Involving a

1

Controlled Substance in the District Court for the State of Alaska, Third Judicial District at Anchorage, in 2007. I reviewed the Information related to this case and noted that WOODS was also initially charged with Misconduct Involving a Weapon in the Second Degree because he possessed a handgun during the commission of an offense under AS 11.71.010-11.71.040. That charge was later dismissed.

2. From approximately April 26 through October 3, 2012, I purchased narcotics from Jason WOODS and other co-conspirators working with Jason WOODS approximately 10 times. During this time, WOODS described two incidents where he personally fired a handgun. WOODS also indicated on at least one occasion that he was looking to purchase a firearm for himself. On other occasions, WOODS discussed purchasing machineguns or fully automatic firearms from me and stated that he preferred to pay for the machineguns with narcotics rather than with cash. WOODS stated that he knew people in the narcotics trafficking business that would pay good money for machineguns, and he intended to take the guns and make a profit, but he also wanted to keep one for himself, telling me that this type of gun is good to have just in case something happens.

3. On August 22, 2012, I made phone contact with WOODS and made arrangements to purchase methamphetamine the following day. I told WOODS I wanted to purchase "one", referring to one ounce of methamphetamine, and WOODS replied that it would not be a problem. WOODS also mentioned during this phone call that he had a large caliber handgun that a friend wanted to sell and also mentioned that he (WOODS) was looking to purchase a .45 caliber handgun. During previous conversations with WOODS, he admitted to owning a Kel-Tec pistol. I asked WOODS if he still had it and WOODS replied that he did, but he was looking for another type of handgun.

4. On August 23, 2012, I called WOODS and WOODS confirmed he would be ready in about an hour. WOODS also mentioned that he and his girlfriend needed a ride from the mall, to WOODS' house. I agreed to pick up WOODS and drove WOODS and his girlfriend to their residence on Turpin Street in Anchorage. On the drive, WOODS made several phone calls to unknown individuals and appeared to be discussing the purchase of narcotics. Upon arrival at WOODS' apartment, I eventually entered WOODS apartment and waited there while WOODS waited for a delivery of methamphetamine.

5. After WOODS conducted several phone calls, he determined that his source of methamphetamine was outside. WOODS asked me to wait in his apartment and

he went outside for a short time. When WOODS returned he asked me to come into his bedroom. WOODS then produced a scale and weighed a bag containing what appeared to be methamphetamine. It weighed 30.2 grams. WOODS stated that the baggie weighed 2.2 grams when empty, and agreed upon a price of $3800 for the ounce of methamphetamine. As I paid WOODS the money, I asked him if he still had his Kel-Tec pistol and told him I wanted to take a look at it. WOODS lifted up his shirt and removed a Kel-Tec 9mm semi-automatic pistol from his waistband. WOODS unloaded it and handed it to me and I clearly observed that it was a Kel-Tec and that it had been loaded before WOODS handed it to me. I asked WOODS if he wanted to sell the pistol but he stated that he didn't. When I handed it back to WOODS, he loaded it and placed it back in his waist band.

6. WOODS then told me that he had to go pay the people who had brought the drugs to him and asked me to wait in his apartment. WOODS left and then returned a few minutes later. At that time, WOODS asked me to come into his bedroom again. WOODS then asked me to "break off" some methamphetamine for him and stated words to the effect that since his source hadn't cut him any, he expected me to give him some. When I pointed out that he had already made a profit on the deal, he became defensive and offered to pay, but he remained adamant that he wanted some. I agreed to give him some as part of the transaction, and took approximately 0.1 gram or less and left it on WOODS' dresser top. WOODS complained that it wasn't enough but I told him the amount I had purchased had to weigh out correctly, so that was the best I could do. Shortly after that, I left the apartment.

7. Later, DEA TFO Rick Pawlak and I field tested the methamphetamine I had purchased from WOODS, with positive results. I turned over the methamphetamine at that time to TFO Pawlak, who subsequently submitted it to the DEA Laboratory for testing. I later received a DEA Laboratory report from TFO Pawlak confirming that the methamphetamine was 98.8% pure with an actual drug weight of 27.2 grams.

8. In my undercover capacity, I continued to purchase methamphetamine from WOODS until approximately October 3, 2012. On that date, I arranged with WOODS to trade machineguns for drugs. However, during the exchange, WOODS discovered that a surveillance team of ATF Agents was in an adjacent room. When the operation was compromised, agents immediately detained WOODS. When they search WOODS, agents discovered a Kel-Tec, Model P-11, 9mm semi-automatic pistol in his pocket. The pistol was loaded with nine rounds of 9mm ammunition. Agents also secured methamphetamine, a meth pipe, and

other drug paraphernalia WOODS had in his pockets. The methamphetamine seized from WOODS later field tested positive for methamphetamine.

9. WOODS was debriefed at that time. WOODS agreed to cooperate with investigators and to introduce an undercover agent to other members of the drug trafficking conspiracy in which he was involved. WOODS was advised of all the rules regarding participation as an informant and agreed to abide by them. WOODS cooperated in two undercover operations, but the next time I tried to contact WOODS, WOODS did not return my call, and eventually it appeared that his phone had been shut off. I made multiple attempts to contact WOODS from mid-October through December, 2012 and also tried to get messages to him that he had to contact me immediately. However, to date, WOODS has not returned my calls and messages or in any way tried to contact me. Furthermore, information I have indicates WOODS is no longer living at his residence and appears to be in hiding.

10. Approximately three weeks ago, I received information from law enforcement sources that indicates that it is possible that WOODS compromised my identity as an undercover agent and has told at least one person involved in his drug trafficking conspiracy that my true occupation is in law enforcement.

/s/ Signature Redacted
Thomas J. King
**Special Agent**
**BUREAU OF ALCOHOL, TOBACCO FIREARMS AND EXPLOSIVES**

SUBSCRIBED AND SWORN TO before me this 28th day of January, 2013, at Anchorage, Alaska.

/S/ SCOTT A. ORAVEC
U.S. MAGISTRATE JUDGE
SIGNATURE REDACTED

Scott Oravec
**United States Magistrate Judge**